**DEXIA CREDIT LOCAL, f/k/a Dexia Public Bank and Credit Local de France, Plaintiff,**

v.

**Peter G. ROGAN, et al., Defendants.**

No. 02 C 8288.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 13, 2004.

Scott T. Mendeloff, Colleen M. Kenney, Gabriel Aizenberg, Courtney Ann Rosen, Sidley, Austin, Brown & Wood Bank One Plaza, Chicago, IL, for Plaintiff.

*MEMORANDUM OPINION
AND ORDER*

SCHENKIER, United States Magistrate Judge.

In March 2004, the plaintiff, Dexia Credit Local, f/k/a Dexia Public Bank and Credit Local de France ("Dexia"), served subpoenas, pursuant to Fed.R.Civ.P. 45, seeking production of documents by Fred Cuppy; Boulevard Investors Ltd. and Boulevard Investors LLC (collectively, the "Boulevard entities"); the Trusts of Sara Caitlan Rogan, Robert Cashman Rogan, and Brian Peter Rogan (collectively, the "Belize Trusts"); and Caribe Trustees, Ltd. ("Caribe" or "Caribe Trustees"). Mr. Cuppy, the Boulevard entities, the Belize Trusts and Caribe all objected to the subpoenas, which led to Dexia filing two motions to compel production of docu-

ments: one directed to Mr. Cuppy (the "Cuppy Motion") (doc. # 113), and the other directed to the Boulevard entities, the Belize Trusts and Caribe Trustees (the "Boulevard Motion") (doc. # 112). Those motions are before this Court pursuant to the district judge's October 5, 2004 referral of all discovery motions (doc. # 110).

After full briefing of the motions, for the reasons stated in the record in open court on November 30, 2004, this Court granted the motions to compel, with some modifications to the categories of documents to be produced. That ruling is summarized in a separate order dated December 8, 2004. In this opinion, we write separately to elaborate on the reasons for the Court's rejection of one argument raised by Mr. Cuppy and Caribe Trustees (sometimes collectively referred to as "the Respondents") in resisting the subpoenas: that requiring production would cause the Respondents to violate the laws of Belize, and subject them to civil liability under those laws.

## I.

In this diversity lawsuit, Dexia alleges that the various defendants perpetrated a multi-million dollar fraud on Edgewater Medical Center that was orchestrated by defendant Peter G. Rogan, who owned Edgewater prior to 1994 and thereafter allegedly controlled its operations and those of the other corporate defendants in the case. The second amended complaint alleges that Mr. Rogan and other defendants gave Dexia false or misleading information about Edgewater's financial condition, in order to induce Dexia to issue a letter of credit guaranteeing Edgewater's obligations on some $56 million in financing bonds, and thereafter fraudulently concealed information about Edgewater's financial situation from Dexia. The second amended complaint alleges that fraudulent siphoning of funds from Edgewater by Mr. Rogan and others caused Edgewater to default on the bonds, which required Dexia to pay on the letter of credit. The second amended complaint further alleges that certain trusts—including the Belize Trusts—"received substantial portions of the revenues [Edgewater] paid to its Rogan-controlled management companies" (Sec.Am.Compl.¶ 43).

As best as the Court can tell, much of the discovery that has taken place to date (and many of the disputes flowing from the discovery requests) has centered on Dexia's attempts to trace the flow of money that Mr. Rogan and other defendants allegedly obtained from Edgewater. Dexia has obtained discovery showing (in its view) suspicious movement of monies into and out of certain irrevocable trusts: the "Florida Trusts," and the Belize Trusts. Mr. Cuppy is the trustee of the Florida Trusts and has asserted, without contradiction by Dexia, that he has produced some 14,000 pages of documents concerning the Florida Trusts (Combined Resp., at 1).

The Rule 45 subpoenas at issue here seek production of documents from Mr. Cuppy and Caribe that concern, *inter alia*, the Belize Trusts. Caribe, a Belize corporation, is the trustee of these trusts (Boulevard Mot., Ex. F); Mr. Cuppy, a United States citizen, is the agent and legal representative for Caribe (Boulevard Mot. at 5, Ex. K).

Mr. Cuppy and Caribe assert that complying with the subpoenas, insofar as they require production of documents pertaining to the Belize trusts, would be contrary to their obligations under the Belize Trusts Act ("the Trusts Act"). They cite to the provisions of the Trusts Act that provide that a trustee "shall owe a fiduciary duty to the beneficiaries of the trusts" (C & C Resp. at 1, Ex. 1, § 27(3)), and that (a) require a trustee to "keep confidential all information regarding the state and amount of the trust property or the conduct of trust administration," and (b) state that a trustee is not obliged to disclose documents that reveal "deliberations as to how he should exercise his functions as trustee," or "the reasons for any decision made in the exercise of those functions," or "any material upon which such a decision was or might have been based" (*Id.*, § 28(2), (3)). Mr. Cuppy and Caribe also assert that an order of this Court that would require them to violate those provisions of the Trusts Act would, in turn, expose them to civil liability for "any loss or depreciation in value of the trust property resulting from the breach,"

and "any profit which would have accrued to the trust had there been no breach" (*Id.*, § 50(1)). On these grounds, Mr. Cuppy and Caribe argue that this Court, under principles of comity, should give respect to these requirements of the Trusts Act and refrain from requiring production (C & C Resp. at 2–3 and n. 1).[1]

## II.

■ In assessing Mr. Cuppy's and Caribe's "foreign law" objection to production of information concerning the Belize Trusts, we begin by setting forth applicable legal principles. At the threshold of a foreign law defense analysis, a court must determine whether a conflict exists between the laws of the United States and those of a foreign country. *See Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y.1993). "[T]he party relying on foreign law bears the burden of demonstrating that such law actually bars the production or testimony at issue." *Id.* "[T]o meet that burden, the party resisting discovery must provide the [c]ourt with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Id.*

■ When a conflict between the law of the United States and a foreign country has been established, a court next must determine: (a) whether the party or non-party from whom the documents are sought is within the Court's enforcement jurisdiction; and (b) whether the party or non-party has possession, custody or control over the documents requested. *See In re Uranium Anti-*

trust Litigation, 480 F.Supp. 1138, 1144 (N.D.Ill.1979). *See also Avery Dennison Corp. v. UCB Films PLC*, No. 95 C 6351, 1998 WL 293002 (N.D.Ill. May 28, 1998). The cogent explanation of these requirements offered by Judge Marshall 25 years ago in *In re Uranium* applies with equal force today:

> The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country. But jurisdiction is less certain when American courts order a [party or non-party] to produce documents located abroad, especially when the country in which the documents are situated prohibits their disclosure. As a general rule, a court has the power to order a person subject to its jurisdiction to perform an act in another state. There are two preconditions for the exercise of this power. First, the court must have personal jurisdiction over the person. Second, the person must have control over the documents. The location of the documents is irrelevant.

480 F.Supp. at 1144. *See also* Advisory Committee Notes, 1991 Amendments to Fed. R.Civ.P. 45 ("Paragraph (a)(2) makes clear that the person subject to the subpoena is required to produce materials in that person's control whether or not the materials are located within the district or within the territory within which the subpoena can be served. The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34.").[2]

---

1. To prove these requirements of Belize law, Mr. Cuppy and Caribe have attached to their response a copy of what purports to be the Belize Trusts Act, Chapter 202, showing the law as in effect on December 31, 2000 (C & C Resp., Ex. 1). Under Fed.R.Civ.P. 44.1, a court's determination of foreign law is itself "treated as a ruling on a question of law." Rule 44.1 gives the Court great latitude in the sources it may consider in determining foreign law, and allows consideration of materials irrespective of whether they are "admissible under the Federal Rules of Evidence." Thus, the fact that the Trusts Act does not appear to have the certification required for it to be self authenticating under Fed.R.Evid. 902(3), and that the Respondents have not offered testimony (through an affidavit or declara-

tion) that it accurately states the current status of Belize law, does not preclude the Court from considering the Trusts Act as evidence of the applicable law of Belize. Inasmuch as Dexia does not quarrel that the Trusts Act accurately sets forth the current state of Belize law pertaining to trusts, for purposes of this motion we will treat the Trusts Act submitted by Mr. Cuppy and Caribe as setting forth relevant principles of Belize statutory law.

2. Thus, while the production is sought from Mr. Cuppy and Caribe, who are not parties to this action, "Rule 45 draws no distinction between parties and non-parties concerning the scope of discovery." Fed.R.Civ.P. 45, Adv. Comm. Notes, 1991 Amendments. Thus, we reject any sugges-

On the issue of control, it is "well-settled that a party need not have actual possession of the documents to be deemed in control of them;" rather, the "test is whether the party has a legal right to obtain them." *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977). *See also Comcast of Los Angeles, Inc. v. Top End International, Inc.*, No. CV 032213 JFWRCX, 2003 WL 22251149, *4 (C.D.Cal. July 2, 2003); *Avery*, 1998 WL 293002, at *2. This definition of control applies to persons and to corporations. *See In re Uranium*, 480 F.Supp. at 1144–45. For example, when the person from whom documents are sought "has practical and actual managerial control over, ... [a] corporate organization[,]" then that person is said to have "control" sufficient to order production of corporate documents. *In re Uranium*, 480 F.Supp. at 1145. *See also Societe Internationale v. Rogers*, 357 U.S. 197, 204, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

"Once personal jurisdiction over the person and control over the documents by [this] person are present, a United States court has power to order production of the documents. The existence of a conflicting foreign law which prohibits the disclosure of the requested documents does not prevent the exercise of this power." *In re Uranium*, 480 F.Supp. at 1145. Indeed, even "[t]he fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." 902 F.2d at 1282 (quoting *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345 (7th Cir.1983)). Thus, in a case where the foreign law that is being asserted as a bar to production is civil rather than criminal sanctions, the case for non-production is less compelling. *First Nat'l Bank of Chicago*, 699 F.2d at 346–47.

Nonetheless, "American courts should not ignore the fact that such a law exists. When two states, both having jurisdiction, prescribe inconsistent conduct, American courts have

developed certain rules of self-restraint governing the appropriate exercise of their power." *In re Uranium*, 480 F.Supp. at 1145. The Seventh Circuit has held that reviewing courts are thus "required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction in light of" various factors set forth in Section 40, Restatement (Second) Foreign Relations Law of the United States (1965) ("Section 40").[3] *See Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat*, 902 F.2d 1275 (7th Cir.1990).

Section 40 of the Restatement (Second) provides as follows:

§ 40. Limitations on Exercise of Enforcement Jurisdiction.

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

In addition to Section 40, the Seventh Circuit law also counsels consideration of portions of Section 442 of the Restatement (Third) of the Foreign Relations Law of the United States ("Section 442"), which provides a "modified balancing test substantially similar to ... Section 40." *Reinsurance Co.*, 902 F.2d at 1282. Section 442 provides:

---

tion by Mr. Cuppy and Caribe that their non-party status, without more, limits their disclosure obligations (C & C Resp. at 2).

**3.** The term "enforcement jurisdiction" refers in this context "to the capacity of a state under international law to enforce a rule of law" such as Rules 26(b)(1), 34 and 45. *See In re Uranium*, 480 F.Supp. at 1144.

§ 442. Requests for Disclosure: Law of the United States.

(1)(a) A court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States.

\*    \*    \*    \*    \*    \*

(c) In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency of the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the state where the information is located.

*See White v. Kenneth Warren & Son, Ltd.,* 203 F.R.D. 369 (N.D.Ill.2001) (applying § 442).

■ Section 442, as interpreted by the Seventh Circuit in *Reinsurance,* does not substantively alter Section 40's balancing test, but it does add a good faith requirement to the analysis:

(2) If disclosure of information located outside the United States is prohibited by law, regulation, or order of court or other authority of the state in which the information is located, ...

(a) a court or agency of the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available[.]

Restatement (Third) of the Foreign Relations Law of the United States, Section 442(2)(a). "Thus, at its discretion, the district court may require a good faith effort from the parties [or non-parties] to seek a waiver of any blocking provisions." *Reinsurance,* 902 F.2d at 1282. The failure of a party raising a foreign law defense has failed to make that good faith effort is a factor that may be considered in requiring production despite the conflict with foreign law. *United States v. Bank of Nova Scotia,* 691 F.2d 1384, 1388–89 (11th Cir.1982).

### III.

It is against the background of these legal principles that we consider, in turn, (a) whether there is a true conflict between the law of the United States (which, in this case, requires production of information concerning the Belize Trusts) and the obligations that Mr. Cuppy and Caribe have under Belize law; (b) the question of personal jurisdiction, and the control of Mr. Cuppy and Caribe over the information at issue; and (c) whether production should be required notwithstanding any conflict between the laws of the United States and those of Belize.

### A.

As set forth above, Mr. Cuppy and Caribe assert that requiring them to produce documents concerning the Belize Trusts would place them into conflict with their obligations under the Trusts Act to keep information about the Caribe Trusts confidential, and that disclosure of the information in violation of Belize law would subject them to the risk of civil monetary liability. Dexia claims that Mr. Cuppy and Caribe have failed to establish that a conflict exists for several reasons.

*First,* Dexia points out that "[Mr.] Cuppy has not produced a copy of the trust formation documents, and nothing in the Belize Trusts Act proscribes production of these documents. Without the formation documents, this Court has no way of knowing whether Belize law is in fact the controlling law of the trust" (Dexia Reply at 5). That is a fair point, and perhaps not merely an academic one. The Trusts Act allows some law other than that of Belize to be selected to govern trusts established in Belize, and further provides that the terms of a trust may permit the governing law initially chosen to be changed at a later time (C & C Resp., Ex. 1, § 4(1), 4(4)). We have no trust documents or other evidence showing that Belize law governs the Belize Trusts. The Respondents

could have addressed this point by offering, if not the actual trust documents, at least an affidavit or declaration setting forth the law governing the Belize Trusts. But, while Mr. Cuppy offered a declaration in connection with the motions, his declaration did not address the issue of what law governs the Belize Trusts.

Nonetheless, the Court will resist the temptation to resolve the foreign law defense on this ground. The Respondents' attorneys are officers of the Court; as such, they are entrusted to conduct this litigation in good faith. We expect that they have made an investigation sufficient to assert that Belize law governs the Belize Trusts (which is a necessary predicate to the Respondents' foreign law defense) in good faith—and that they are aware of the consequences for a failure to do so. Thus, for purposes of ruling on the foreign law defense here, we will assume that Belize law governs the Belize Trusts.

■ *Second*, Dexia argues that there is not a conflict between United States law and Belize law because the Trusts Act "refers only to prohibitions placed on the *trustee*" (Dexia's Reply at 5) (emphasis added). In other words, Dexia argues the Trusts Act imposes a fiduciary duty upon Caribe (the Trustee), but not Mr. Cuppy (the Trustee's agent), so that foreign law poses no conflict with Mr. Cuppy's production obligations under United States law. We are not persuaded by Dexia's argument. The Trusts Act expressly states that the trustee owes a fiduciary duty to the beneficiaries of a trust to maintain the privacy of the trust information (C & C Resp., Ex. 1, §§ 27(4), (6), 28(2)). There is no indication in the Trusts Act that an agent or legal representative of the trust has any different or lesser obligations to the beneficiaries. Indeed, were that the case, a trustee could evade his or her fiduciary duties to beneficiaries by the simple expedient of ordering a minion do what the trustee

itself could not. Dexia has offered no authority to show that Belize law would permit such a result, and we are unwilling to indulge the assumption that it does.[4]

*Third*, Dexia argues that the Respondents' assertion of a conflict between an order of this Court to produce documents and the fiduciary obligations imposed by the Trusts Act to keep the requested documents private is speculative at best (Dexia Reply at 5)("Cuppy provides only a conclusory suggestion that civil liability *may* be imposed on them at some point in the future by some unidentified party if Dexia used the requested documents in efforts to enforce a judgment against those Belize trusts"). The Court agrees that the liability Respondents contend they may suffer under Belize law if they produce the requested documents is potential rather than inevitable. However, unless authorized by the terms of the trust or elsewhere in the Trusts Act, production of trust documents by the Trustee to anyone other than the beneficiaries, the settlor, the Attorney General in certain designated instances, a charity for which the trust is established, or courts of Belize would appear to breach the confidentiality provisions in the Trusts Act, (C & C Resp., Ex. 1, Section 28(1), (2)). Dexia does not fall within the description of those persons or entities to whom the Trustee may disclose information about the Belize Trusts under the Trusts Act. And, "a trustee who commits or concurs in a breach of trust is liable for" civil damages (*Id.* § 50(1)).

Thus, on the face of the Trusts Act, there is an apparent conflict between an obligation of the Respondents to produce documents to Dexia under United States law and their obligation not to do so under the cited provisions of Belize law. The extent to which that conflict can be avoided notwithstanding the production of documents, and the speculative nature of any potential civil liability to Mr. Cuppy and Caribe Trustees under Belize law,

---

**4.** We note that under Illinois law, trust managers who control the action of the trustee in the management of the trust property occupy a fiduciary relationship to the trust beneficiaries. "Courts of equity have refused to set any bounds on the circumstances out of which a fiduciary relation may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists in fact, where confidence is reposed on one side and domination and influence result on the other." *Wallace v. Malooly*, 4 Ill.2d 86, 122 N.E.2d 275, 279 (1954).

are factors that are best considered in deciding whether the apparent conflict warrants relieving the Respondents of their production obligations under United States law (*see* Section III. C., *infra*).

### B.

We now turn to the question of personal jurisdiction and control, which need not detain us for long. Neither Mr. Cuppy nor Caribe have raised personal jurisdiction defenses or other defects to the exercise of this Court's enforcement jurisdiction over the subpoenas issued to them, even though they both object to these subpoenas and have filed appearances in this Court resisting the motions to compel. Thus, the Court finds that we have personal jurisdiction over both of these nonparties. *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 663 (7th Cir.1986) (failure to raise special affirmative defense of personal jurisdiction in responsive motion may constitute a waiver of that defense under Rule 12(h)(1)); 18 Fletcher Cyclopedia of Private Corp. § 8659 ("[w]here a foreign corporation voluntarily appears in an action against it, it waives all objection to the jurisdiction of the court, and it is as much subject to that jurisdiction as if it were a domestic corporation"). As trustee, Caribe scarcely could argue it lacks control over the documents—and, in fact, it offers no such argument. Mr. Cuppy does not deny that he also has "control" over the Belize Trusts (and the documents about them) (Boulevard Mot., at 5, ¶ 19, Ex. 0), despite the designation of Caribe as the Trustee (*Id.*).

Thus, because the Court has personal jurisdiction over Respondents, and they have control over the documents at issue, the Court finds that it has the power to order the Respondents to produce the documents requested by Dexia in its subpoenas. *See In re Uranium*, 480 F.Supp. at 1145. The question we address below, therefore, is whether the Court should order the production.

### C.

■ Despite the apparent conflict between United States and Belize law, the Court finds that, on balance, the interests of comity do not warrant relieving the Respondents of their production obligations in this case. "Comity" in this context means "the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *SEC v. Banner*, 211 F.3d 602, 612 (D.C.Cir.2000). To guide courts in determining how the interests of comity should be weighed, the Seventh Circuit has adopted the balancing tests set forth in Section 40 of the Restatement (Second), as well as Section 442 of the Restatement (Third), which provides a "modified balancing test substantially similar to ... Section 40." *See Reinsurance Co.*, 902 F.2d at 1282. For purposes of our analysis of the comity issue, we apply the Restatement factors endorsed by the Seventh Circuit under Section 40 of the Restatement (Second), with due consideration to the "good faith" consideration added by Section 442 of the Restatement (Third). *Reinsurance Co.*, 902 F.2d at 1279–82.

#### 1.

Under Section 40(d), the nationality of the person asserting foreign law as a bar to production should be considered in determining whether to order production. Mr. Cuppy is a United States citizen, who resides in the United States and who is subject to the laws of the United States. Even though Caribe Trustees is a Belize corporation, subject to the laws of that sovereign, Caribe has its offices in Merriville, Indiana (Boulevard Mot., Ex. S), and it has submitted to the jurisdiction of this Court.

In our view, the nationality of Mr. Cuppy plainly weighs in favor of requiring him to comply with obligations imposed by the laws of the United States. As for Caribe, its status as a citizen under the laws of Belize is a factor that, standing alone, might weigh in favor of giving primacy to its obligations under Belize law. However, that factor is mitigated here not only by the considerations we discuss below, but also by the fact that Caribe maintains offices in the United States. By choosing to locate in the United States and to take advantage of the laws of the United States in doing so, Caribe has weakened its argument that Caribe's obligations under Belize law should trump its obligations under United States law.

### 2.

As a matter of law, "[t]he location of the documents is irrelevant" to the requirement to produce them. *In re Uranium,* 480 F.Supp. at 1144–45. Because the Court has personal jurisdiction over the Respondents, the Court also has power to order them to perform an act in another "state"—*i.e.,* Belize—that may be required for production. *Id.* (citing *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 203–05, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)). *Cf. Dietrich v. Bauer,* No. 95 Civ. 7051, 2000 U.S. Dist. LEXIS 11729 (S.D.N.Y.2000) (if the court has personal jurisdiction over a non-party, and if the non-party has control of the materials sought, then the court can order the non-party to comply with a subpoena for documents even though the documents are in the possession of a person over whom there is no personal jurisdiction). Nonetheless, Section 40(c) counsels us to consider "the extent to which the required conduct is to take place in the territory of the other state." Therefore, we consider where the production of information concerning the Belize Trusts would occur.

No one has informed the Court where the documents at issue currently are located. It may be that the documents are located in Belize; but also may be the case that some or all are located in Merriville, Indiana, where Mr. Cuppy and Caribe both maintain offices. Moreover, the subpoena specifies that production of the documents is to be made in Chicago. And, we have little doubt that Mr. Cuppy and Caribe have the ability to bring the documents from wherever they may be—Belize, Indiana, or somewhere else—for production in Chicago; certainly, they do not claim an inability to do so. On the record presented, we do not consider the present location of the documents to weigh in favor of relieving the Respondents from their production obligations.

### 3.

We next consider the "extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person" being ordered to produce documents. Restatement (Second) Section 40(b). The Trusts Act is a civil, rather than a criminal, law. Even the fact that a foreign law may subject a person to criminal sanctions in a foreign country does not automatically bar a court from compelling production. *See Reinsurance,* 902 F.2d at 1282; *First Nat'l Bank of Chicago,* 699 F.2d at 346–47. The civil liability the Trusts Act authorizes for violation of its terms does not create the kind of hardship on Respondents that weighs against the United States interest in ordering production of documents for three reasons.

*First,* the fact that any civil liability from requiring the Respondents to produce trust information is "potential"—rather than inevitable—matters here. The potential nature of the conflict matters in the first instance because the Trusts Act provides ways around any "inconsistent conduct" due to production by Respondents. According to Section 28(1)(b) of the Trust Act, the Trustee "shall so far as reasonable and within a reasonable time ... provide full and accurate information as to the state and amount of the trust property and the conduct of the trust administration to ... (b) the settlor or protector of the trust; ... (d) subject to the terms of the trust, any beneficiary of the trust who is of full age and capacity...." C & C Resp., Ex. 1, § 28(1)(b), (d). Thus, if Mr. Rogan is the settlor of the Belize Trusts and his adult children are the beneficiaries, then under the Trusts Act they are entitled to receive the documents being requested by Dexia. Under these circumstances, if the Respondents provided the requested trust information to Mr. Rogan and/or his adult age children, the Respondents could produce them to those individuals (who then could produce them to Dexia) without any conflict between United States and Belize law.

Indeed, Dexia states that it has "independently subpoenaed" the Caribe Trust beneficiaries, whom they claim are Mr. Rogan's adult children (who are approximately 26, 23 and 19 years old); Dexia says that "[i]n response to these subpoenas, counsel for Robert and Sara Rogan independently requested that Mr. Cuppy provide the documents sought by Dexia[,]" but, to date, Mr. Cuppy has refused to produce those documents (Dexia Reply at 5, n. 4 and Ex. A).

We also note that Mr. Rogan's attorneys have represented in open court that Caribe has refused Mr. Rogan's request for trust information. We see nothing in the Trusts Act that would allow Caribe or its agent, Mr. Cuppy, to withhold trust information from the settlor or the trust beneficiaries.

Respondents protest that Dexia has incorrectly asserted as fact that the Belize Trusts are "in the names of Rogan's immediate family members" (*i.e.,* the three Rogan children) and that Mr. Rogan "caused" the Belize Trusts to be "created and funded." Respondents argue that Dexia cites no evidence that Mr. Rogan "created and funded" the Belize Trusts; and evidence referring to the trusts " 'in the names of Rogan's immediate family members' are the 'Florida Trusts[,]' " and Mr. Cuppy has already produced all the records concerning trusts (C & C Sur–Reply, at 1). We have the following observations about this argument.

It appears from the evidence submitted by Dexia in support of the motion to compel that the likely beneficiaries of the Belize Trusts are the Rogan children. We use the word "appears" purposefully, because the evidence is not extensive, and is not definitive. For example, in Exhibit O to the Boulevard Motion, Dexia attaches a letter dated June 3, 1997 from Mr. Cuppy to Mr. Troy Meyers, escrow agent, which states (emphasis added):

> We have ascertained that the kids are purchasing 49.5% of Peter's interest at a cost of $13,500.00 each. I am enclosing three checks from the trust to purchase 16.5% each from each trust. The other 10.5% will be gifted to the 92 trusts and not to *these Belize trusts that I have for the kids* . . . . .

These as well as other exhibits submitted by Dexia (*see* Boulevard Motion, Exs. O (07/17/97 letter), P, S) suggest that the Rogan children are beneficiaries of the Belize Trusts.

By contrast, Mr. Cuppy and Caribe have offered no evidence to show the identity of the beneficiaries. Mr. Cuppy has declined to reveal who the beneficiaries of the Belize Trusts are (*see* Boulevard Mot., Ex. K, at 3 (where counsel for Respondents asserts, with regard to the Belize Trusts, that "[i]nformation regarding who established the trusts and who the beneficiary may be, is, in Mr. Cuppy's opinion, privileged and therefore he could not provide that information")), and the trust formation documents for the Belize Trusts have not been produced yet. All that Respondents have done to support their foreign law defense on this point is to assert that Dexia has failed to establish, beyond question, that the Rogan children are the beneficiaries of the Belize Trusts. As we explained above, it is Respondents who have the burden of proving their foreign law defense. In discharging that burden, Respondents must show the hardship that would be imposed were production of documents deemed to violate their fiduciary duties to the beneficiaries of the Belize Trusts—a hardship Respondents have described as exposure to civil liability. Respondents' failure to disclose who the beneficiaries are (or even who they are not) does little to persuade the Court that Dexia is incorrect in its assertion that the Rogan children are beneficiaries of the Belize Trusts; or that Respondents have significant risk of facing civil liability under Belize law; or that Respondents lack a means to avoid the risk of civil liability.[5]

*Second,* it is not altogether clear that the fiduciary obligations Caribe and Mr. Cuppy owe to the beneficiaries under the Trusts Act (whoever they may be) would be breached by producing the requested documents. Section 27(6)(b) of the Trusts Act states that, "[e]xcept with the approval of the Court or in

---

**5.** As for Respondents' assertion that there is no evidence offered by Dexia that Mr. Rogan is the settlor of the Belize Trusts, that is true. But, Respondents have not offered any evidence that Mr. Rogan (or some other party or subpoenaed entity) is not the settlor, and they never directly deny that he is. Rather, all the Respondents say is that Dexia has not proved that Mr. Rogan is the settlor. We reiterate that the burden of showing conflicting obligations under United States and Belize law, sufficient to resist a United States order of production, belongs to Respondents, not Dexia. Thus, Respondents' failure to offer evidence that someone other than Mr. Rogan (and unconnected with this case) is the settlor of the Belize Trusts, in no way advances their foreign law claim to show a realistic risk of facing civil liability under Belize law for complying with a production order in this case.

accordance with the terms of the trust or the provisions of this Act, a trustee shall not ... cause or permit any other person directly or indirectly to derive any profit from his trusteeship; ..." Dexia alleges that various defendants have used the Belize Trusts, for their benefit: to hide money improperly obtained from Edgewater. The subpoenas request documents that are relevant to that allegation. We also note that under the Trusts Act, a trust is invalid and unenforceable if it "purports to do anything contrary to the law of Belize" (C & C Resp., Ex. 1, § 7(2)(a)(i)), or if a Belize court declares that "the trust is immoral or contrary to public policy" (*Id.*, § 7(2)(b)(ii)). If documents produced show that the Belize Trusts were used to help commit or conceal fraud, the trusts might be invalid under Belize law; and if the Belize trusts are invalid, it may be that there are no fiduciary duties that would be breached by that production.

*Third,* in assessing any hardship that complying with United States law might impose on Mr. Cuppy and Caribe under Belize law, we consider Respondents' failure to seek the guidance of the Belize courts on their obligations under Belize law. Certainly, the Respondents have had ample time to do so; the subpoenas were served more than eight months ago. We have been offered no reason why the Respondents could not have sought an order clarifying their obligations under the Trusts Act: such as, whether Belize law requires them to honor the confidentiality provisions of the Trusts Act, even if production might disclose circumstances that could lead to the trusts being held invalid under Belize law. Section 28 of the Trusts

Act states that a trustee is not obligated to disclose information, "subject to: ... any order of the Court ..." Section 59 states: "A trustee may apply to the Court for directions as to how he should or might act in any of the affairs of the trust and the Court may make such order as it thinks fit." The type of order made is governed by Section 58(a)(i), which empowers courts to make orders "in respect of the ... administration ... of a trust" upon application of a trustee). We have been offered no reason why Respondents could not have sought an order of the Belize courts specifically authorizing them to disclose the trust information. The failure of Respondents to take good faith steps to avoid a conflict with Belize law weighs against relaxing their obligations under United States law. *Bank of Nova Scotia,* 691 F.2d at 1388–89.[6]

### 4.

We consider together the remaining two factors under Section 40: "the vital national interests of each of the states" (Section 40(a)), and "the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state" (Section 40(e)). For the reasons set forth below, we conclude that these factors weigh in favor of production.

In balancing the "vital national interests" of the United States and Belize, at the outset we freely confess our limited ability "to evaluate the economic and social policies of a foreign country." *Reinsurance,* 902 F.2d at 1280 (quoting *In re Uranium,* 480 F.Supp. at 1148). However, that limited ability does not

---

6. In *First Chicago,* the Seventh Circuit remanded a case in which the district judge had rejected a foreign law defense to production of documents, ordering the district court to consider whether to require First Chicago to make a good faith effort to obtain permission from Greek authorities to permit the production. 699 F.2d at 346. The Seventh Circuit noted that the district judge had made no findings on the good faith effort, *vel non,* of First Chicago to seek that permission. *Id.* at 347. The Seventh Circuit distinguished *Bank of Nova Scotia* on the grounds that the district court in that case had made a finding that there was no good faith effort to comply with the subpoena; that the potential liability in that case was civil and not (as in *First Chicago*)

criminal; and there appeared to be greater latitude under the foreign law at issue in *Bank of Nova Scotia* to relax the prohibition on production than appeared on its face to be the case with the foreign law at issue in *First Chicago. Id.* at 347.

Thereafter, in *Reinsurance,* the Seventh Circuit cited both cases with approval, noting that "at its discretion, the district court may require a good faith effort from the parties to seek a waiver of any blocking provisions." 902 F.2d at 1282. Exercising that discretion, we see no purpose in delaying a ruling here to permit the Respondents to seek a ruling from the Belize courts that they have not seen fit to pursue in the eight-plus months since the subpoenas were served.

relieve us of the obligation to assess those interests as best we can, based on the record that we have.

As for the interest of the United States, our civil litigation system is premised on the concept of full and liberal discovery, which enforcing the subpoenas here would vindicate. Liberal discovery is not an end in itself, but rather is a means to achieve a larger goal: the just adjudication of civil disputes. That goal is of great significance here, in a case where this litigation asserts a substantial fraud that allegedly was committed by United States citizens in the United States. The United States has a strong interest in ferreting out and remedying such fraud if it occurred—and, equally, in exonerating any who may be wrongly accused of it. Moreover, an order of production issued to the Respondents "can reasonably be expected to achieve compliance" with the discovery rules. The Respondents have submitted to the jurisdiction of the Court, and the Court has broad authority to enforce its orders.

Against these interests, "we must weigh the opposing side of the balance" under Belize law. *Reinsurance,* 902 F.2d at 1280. The national interests of Belize include an interest in protecting the privacy and confidentiality of the trust information, as expressed in Section 28(2) of the Trusts Act. But, the Trusts Act also reveals that Belize has a strong interest in not allowing its trust laws, and the trusts created under them, to be used for fraud. *See* C & C Resp., Ex. 1, § 7(2)(b)(ii) (trust is invalid if it is "immoral or contrary to public policy," or was "established by ... fraud"). This Belize interest in preventing fraud is consistent with United States' national interests and weighs in favor of issuing an order of production, because it suggests that a conflict in the respective national interests may be more apparent than real. To the extent that Belize law might give primacy to privacy interests—in derogation of the Belize interest in not allowing its trusts to be used for fraud, *see, e.g., Higashi v. Brown,* No. 95–03072, 1996 WL 33657614, *3–4 (Bankr.D.Alaska Mar.11, 1996), these are not interests that we could consider "vital" or to which we would feel obliged to give comity.

Finally, it is unclear whether action would be taken against Mr. Cuppy or Caribe in Belize, were they to produce the documents in question. While Section 50(1) of the Trusts Act allows for civil liability to be imposed for breach of those provisions, for that liability to arise, someone would have to sue the Respondents in the Belize courts. The Respondents have provided no guidance as to the vigor with which the Belize courts have enforced the confidentiality provision of Section 28(2). Additionally, Section 53(1)(A) of the Trusts Act allows the beneficiaries of a trust to relieve a trustee of liability for a breach of trust, or to indemnify a trustee against liability for a breach of trust. If the Rogan children are beneficiaries, and are under the same obligations as Mr. Cuppy and Caribe to produce the documents Dexia seeks, we do not see any realistic chance of liability resulting from production.

Moreover, even if Respondents breached the Trusts Act and were not relieved of that liability by the beneficiaries pursuant to Section 53(1), under Section 54 the Belize courts nonetheless can relieve a trustee of liability where "the trustee has acted honestly and reasonably and ought fairly to be excused for the breach of trust or for omitting to obtain the directions of the Court in the matter in which the breach arose." A Belize court might well excuse Mr. Cuppy and Caribe from any breach arising from compliance with a production order issued by this Court, which is designed to allow discovery of information that may affect the validity of the Belize Trusts under Belize law. Again, that is especially so if, as the evidence here suggests, the Rogan children are beneficiaries. If the children are beneficiaries of the Belize Trusts, Mr. Cuppy and Caribe must give them the trust information on their request (putting that information within the children's control), and the way we read the Trusts Act, Belize law imposes no liability on the children for producing the trust information to Dexia. Thus, as a practical matter, it is difficult to see how production by the Respondents to Dexia of that same trust information would harm any legitimate interests of the beneficiaries.

## CONCLUSION

For the reasons stated above, the Court rejects the Respondents' foreign law defense to production under the subpoenas. Therefore, in line with the separate order of December 8, 2004, production of information concerning the Belize Trusts that is responsive to the subpoenas (as modified in the December 8, 2004 order), will be required.